IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LAKEYSIA WILSON**                                                                  **PLAINTIFF**

**v.**                             **Case No. 4:22-cv-00775-LPR**

**ARKANSAS DEPARTMENT OF**
**HUMAN SERVICES**                                                    **DEFENDANT**

## ORDER

This case concerns alleged employment discrimination. Plaintiff LaKeysia Wilson used to work for the Arkansas Department of Human Services in its Division of Youth Services. She believes the Department underpaid her in comparison to her male colleagues that performed substantially equal work. Ms. Wilson brings two federal-law claims against the Department: (1) an Equal Pay Act claim and (2) a Title VII sex discrimination claim.[1] Pending before the Court is the Department's Motion for Summary Judgment.[2] The Department seeks summary judgment on both claims.[3] For the reasons discussed below, that Motion is GRANTED.

## LEGAL STANDARD

Summary judgment is inappropriate unless, "viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."[4] "An issue of fact is genuine when 'a reasonable jury could return

---

[1] *See* Am. Compl. (Doc. 18) at 1. Ms. Wilson's Amended Complaint also raised Title VII race-discrimination claims, 42 U.S.C. § 1983 claims, and declaratory judgment claims against the Department. *Id.* These additional claims were dismissed in a previous Order. *See* Order (Doc. 22) at 1–2. And although the Amended Complaint makes an oblique reference to the Fourteenth Amendment, *see* Doc. 18 at 1, the Court does not read the Amended Complaint to raise a stand-alone Fourteenth Amendment claim.

[2] Doc. 29.

[3] *See id.*

[4] *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).

a verdict for the nonmoving party' on the question."[5]  "To be material, the disputed facts must be facts which, under the substantive law governing the issue, might affect the outcome of the suit."[6]

When evaluating a defendant's motion for summary judgment, the Court must read the record in a very particular way.  If a fact is undisputed—or not genuinely disputed—the Court adopts it.[7]  If a fact is genuinely disputed (and material), the Court adopts the most pro-plaintiff version of that fact that a reasonable jury could find to have occurred.[8]  The Court must then draw all reasonable inferences from the adopted "facts" in favor of the plaintiff.[9]  Essentially, the Court constructs the most pro-plaintiff version of the record that a reasonable jury could possibly countenance.[10]  Then, considering that version of the record, the Court analyzes whether the defendant is entitled to judgment as a matter of law.[11]

The foregoing standard could be fairly characterized as very pro-plaintiff.  So far, so good for Ms. Wilson.  But there's a catch.  Pursuant to the Final Scheduling Order, all motions for summary judgment must comply with Local Rule 56.1.[12]  That rule requires the moving party to "annex to the notice of motion a separate, short and concise statement of the material facts as to which it contends there is no genuine dispute to be tried."[13]  Any fact set forth in such a statement that is not controverted in a similar statement filed by the nonmoving party is deemed admitted by

---

[5] *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[7] *See Smith v. Crittenden Cnty.*, No. 22-cv-00042, 2024 WL 2194847, at *3 (E.D. Ark. May 15, 2024).

[8] *See Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

[9] *See id.*

[10] *See id.*

[11] *See Samuels v. Kansas City Mo. Sch. Dist.*, 437 F.3d 797, 801 (8th Cir. 2006).

[12] Final Scheduling Order (Doc. 26) at 2.

[13] Local R. 56.1(a).

the nonmoving party.[14]  The glaring problem for Ms. Wilson is that she did not file a responsive statement.[15]  So the Court must accept as true all properly stated and supported facts in the Department's Statement of Undisputed Facts.[16]  With the foregoing principles in mind, the Court will now set out the background facts that will be used to decide the instant Motion.

## BACKGROUND

Before Ms. Wilson was hired by the Division of Youth Services, she previously worked for the Department's Division of Aging and Adult Services.[17]  She was initially hired by the Division of Aging and Adult Services (on or about June 11, 2011) as a Field Investigator.[18]  She was later promoted to Program Supervisor, where she was classified at the C119 paygrade and received a salary of $36,183.68.[19]

This first stint with the Department did not end favorably for Ms. Wilson.  On September 30, 2014, the Department executed a Performance Improvement Plan for Ms. Wilson, but Ms. Wilson refused to sign it.[20]  Roughly a week later, Ms. Wilson was issued a written warning for failure to complete certain work assignments.[21]  And although Ms. Wilson was given new

---

[14] Local R. 56.1(c).

[15] In fact, Ms. Wilson did not file any responsive documents to the Department's Motion.  Unfortunately, that means that the Court will decide the instant Motion with nearly no input from Ms. Wilson.  To be clear, the Court can't consider the allegations contained in the Amended Complaint for purposes of deciding the instant Motion unless such allegations were admitted in the Department's Answer.  *See Thomas v. Hungerford*, 23 F.3d 1450, 1454 (8th Cir. 1994) ("A plaintiff opposing a properly supported summary judgment motion may not rest upon the allegations in his complaint.").  Had the Amended Complaint been verified, it would have been treated as an affidavit (or declaration) and considered part of the factual record for summary judgment purposes.  *See Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994–95 (8th Cir. 2001).  But Ms. Wilson's Amended Complaint was not verified, so its contents remain mere allegations.  And at this stage of the proceedings, the Court can't rely on mere allegations, no matter how well-pled.

[16] Of course, the Court need not (and will not) accept legal conclusions as true merely because they were included in the Department's unopposed Statement of Undisputed Facts.

[17] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 1.

[18] Am. Compl. (Doc. 18) ¶ 5; Answer (Doc. 23) ¶ 6.

[19] Am. Compl. (Doc. 18) ¶ 5; Answer (Doc. 23) ¶ 6.

[20] Ex. 6 (Aff. of P. Danielle Burns) to Def.'s Mot. for Summ. J. (Doc. 29-6) at 3.

[21] *Id.*

assignments after this written warning, she continued to struggle with meeting her employer's performance expectations.[22] Ultimately, Ms. Wilson was terminated from the Division of Aging and Adult Services in October of 2014.[23]

Ms. Wilson wouldn't be away from the Arkansas Department of Human Services for long. She was again hired by the Department in June of 2015, this time as a JDC Monitor in its Division of Youth Services.[24] JDC Monitors in the Division of Youth Services are responsible for fulfilling a broad range of job duties. JDC Monitors are tasked with monitoring jails, juvenile detention centers, and juvenile programs and facilities.[25] They prepare reports and manage corrective action.[26] They provide technical assistance.[27] They perform juvenile advocacy services.[28] And

---

[22] *See id.* at 3–4.

[23] *See id.* at 4; Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 1–2. Ms. Wilson's termination from the Division of Aging and Adult Services is not directly at issue in the instant case. It was, however, the subject of prior litigation. *See Wilson v. Ark. Dep't of Human Servs.*, No. 4:15-cv-00466-SWW (E.D. Ark. filed July 28, 2015).

[24] Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 3–4. The record shows that, although this position had the "Functional Title" of JDC Monitor, it had the "OPM Job Title" of Youth Services Advisor. Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 9. Nothing in the record illuminates the import of this distinction. But the most pro-plaintiff read of the record suggests that "JDC Monitor" and "Youth Services Advisor" are, at the very least, positions that perform substantially equal work. This is the most pro-plaintiff read of the record because it enables Ms. Wilson to use a male Youth Services Advisor named Ricky Gaston as a comparator for the purpose of establishing a prima facie Equal Pay Act case. *See infra* page 14.

[25] Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 9. This part of the job includes interviewing staff and juveniles, collecting data and documentation, recording the results of evaluations and interviews, analyzing data, developing findings, and providing immediate notification to agency officials and/or the Child Abuse Hotline when appropriate. *Id.*

[26] *Id.* at 10. This part of the job includes preparing correspondence and reports, analyzing data, assisting in the preparation of the annual monitoring report to the Office of Juvenile Justice and Delinquency Prevention, evaluating and responding to proposed corrective action, monitoring completion of corrective action, and evaluating the effectiveness of corrective action in correcting and preventing problems. *Id.*

[27] *Id.* This part of the job includes assisting agencies housing juvenile offenders by answering questions and making recommendations, assisting juveniles by answering and referring questions and concerns, reviewing and commenting on proposed policies and procedures, assisting with problem solving, and serving as the liaison between the Department of Youth Services and agencies operating jails and juvenile detention centers. *Id.* This part of the job may also require the JDC Monitor to serve on task forces and work groups and to assist in providing training. *Id.*

[28] *Id.* This part of the job includes communicating with juveniles at facilities to assist in addressing grievances and concerns, advocating for the interest of juveniles in the areas of health, welfare, and safety, and following up to ensure that the concerns of said juveniles are appropriately addressed. *Id.*

they assist in additional duties and special projects under the direction of the Juvenile Justice and Delinquency Prevention Manager.[29]

At the time Ms. Wilson was rehired, state law classified the JDC Monitor position at the C115 paygrade.[30] Ms. Wilson was rehired at this paygrade rather than the higher C119 paygrade she had received during her employment with the Division of Aging and Adult Services.[31] About two years later, in July of 2017, state law reclassified the JDC Monitor position at the GS-6 paygrade.[32] Prior to the reclassification, Ms. Wilson's salary was $29,251.04.[33] The record does not show whether the July 2017 reclassification affected Ms. Wilson's salary.[34]

Overall, we don't know much about Ms. Wilson's time as a JDC Monitor.[35] But we do know that Ms. Wilson was reassigned to the Internal Affairs Unit of the Department of Youth Services—to work as an Internal Affairs Investigator—on or about August 21, 2019.[36] Like the JDC Monitor position, the Internal Affairs Investigator position was classified at the GS-6

---

[29] *Id.*

[30] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 6.

[31] *See* Am. Compl. (Doc. 18) ¶ 24; Answer (Doc. 23) ¶ 25 (admitting that "the Division of Youth Services did not hire the [P]laintiff at the salary she had when the Division of Aging and Adult Services terminated her in 2014").

[32] *See* Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 19 (stating that the "Youth Services Advisor position[] became classified at a GS-6 paygrade"). The most pro-plaintiff read of the record suggests that "Youth Services Advisor" is another name for the JDC Monitor position. *See supra* note 24.

[33] Am. Compl. (Doc. 18) ¶ 11; Answer (Doc. 23) ¶ 12.

[34] Ms. Wilson's Amended Complaint alleges that the reclassification resulted in a substantial pay increase. *See* Am. Compl. (Doc. 18) ¶ 12. But the Department denies this allegation. Answer (Doc. 23) ¶ 13. And there is no record evidence on this specific point. Moreover, the record does not contain any evidence regarding the way the old pay scale (with grades like C115) lines up with the post-reclassification pay scale (with grades like GS-6).

[35] The record does show that Ms. Wilson received a less-than-stellar performance evaluation in August of 2016. *See* Ex. 6 (Aff. of P. Danielle Burns) to Def.'s Mot. for Summ. J. (Doc. 29-6) at 5–7. Indeed, she just barely avoided an "unsatisfactory" rating in all her duty areas. *See id.* at 5–6 (consistently giving Ms. Wilson's performance in each duty area a rating of "3," just barely above the 2.99 "unsatisfactory" cutoff). Ms. Wilson filed an appeal challenging her performance evaluation. *See id.* at 9–16. The record does not indicate the outcome of Ms. Wilson's appeal.

[36] Ex. 4 (Aff. of Michael Crump) to Def.'s Mot. for Summ. J. (Doc. 29-4) ¶ 3.

paygrade.[37] Ms. Wilson remained an Internal Affairs Investigator until she resigned from the Department in April of 2022.[38]

Five months before her resignation, Ms. Wilson filed a charge of employment discrimination with the Equal Employment Opportunity Commission. In this December 2021 charge, Ms. Wilson alleged race and sex discrimination in violation of the Equal Pay Act and Title VII of the Civil Rights Act.[39] She specifically named two male employees—Thomas Messer and Ricky Gaston—as relevant comparators.[40] She received a right-to-sue letter from the EEOC in June of 2022.[41]

That's all the record tells us about Ms. Wilson's employment with the Department. But the record does provide information about the two Division of Youth Services employees named in Ms. Wilson's EEOC charge. Let's start with Thomas Messer. Mr. Messer was hired by the Division of Youth Services in July of 2016 as a JDC Compliance Monitoring Coordinator.[42] At the time of his hiring, this position was classified at the C117 paygrade.[43] Upon taking his position, Mr. Messer was trained in certain aspects of his job by Ms. Wilson.[44] After this training, Mr. Messer performed several job duties that did not overlap with those performed by

---

[37] *Id.*; Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 19.

[38] Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 3. The Department asserts in its briefing that Ms. Wilson never responded to its Requests for Admission. Br. in Supp. of Mot. for Summ. J. (Doc. 31) at 1. Ms. Wilson has not disputed this assertion. All statements contained in the Department's Requests for Admission are therefore deemed admitted, and thus conclusively established. *See* Fed. R. Civ. P. 36(a)(3); Fed. R. Civ. P. 36(b). It is true that Ms. Wilson's Amended Complaint contradicts the record evidence, stating that her resignation occurred in April of 2021. Am. Compl. (Doc. 18) ¶ 25. But, for the reasons stated *supra* note 15, that's not enough to create a genuine fact dispute.

[39] Ex. 7 (Reqs. For Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 5; Am. Compl. (Doc. 18) at 7.

[40] Am. Compl. (Doc. 18) at 7.

[41] *Id.* ¶ 34; Answer (Doc. 23) ¶ 35.

[42] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 10.

[43] *See id.* ¶ 11. As a reminder, Ms. Wilson's JDC Monitor position was classified at the C115 paygrade.

[44] *Id.* ¶ 13.

Ms. Wilson.[45] At some point in 2018 (no later than April), Mr. Messer was reassigned to the Staff Development Coordinator position, which involved training Division of Youth Services facility employees.[46] His duties in this new position did not substantially overlap with those required of Ms. Wilson,[47] and he did not work with Ms. Wilson in this new position.[48]

---

[45] For example, Mr. Messer was responsible for working on an annual report to the Office of Juvenile Justice and Delinquency Prevention. *Id.* ¶ 14. Ms. Wilson did not work on those annual reports. *Id.* It is true that there is some evidence in the record that suggests that working on these annual reports may have been among Ms. Wilson's assigned job duties. *See* Ex. 6 (Aff. of P. Danielle Burns) to Def.'s Mot. for Summ. J. (Doc. 29-6) at 5 (showing that Ms. Wilson's Performance Evaluation Form stated that "she has not completed the task of creating an Annual Report to OJJDP. The JJDP Unit is developing and providing her with some additional training in this area to get her prepared for this task"); Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 9 (showing that JDC Monitors are required to assist in the preparation of the annual monitoring report to the Office of Juvenile Justice and Delinquency Prevention). But even if Ms. Wilson was assigned to work on these reports in some capacity, the record demonstrates that she did not perform such work. *See* Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 14; Ex. 3 (Aff. of Thomas Messer) to Def.'s Mot. for Summ. J. (Doc. 29-3) ¶ 5; Ex. 6 (Aff. of P. Danielle Burns) to Def.'s Mot. for Summ. J. (Doc. 29-6) at 5. And the record also shows that Mr. Messer was assigned additional responsibilities that did not overlap with those assigned to Ms. Wilson. Mr. Messer was required to (1) "conduct[] outreach to build rapport with law enforcement agencies and local official[s] to facilitate data collection and report[ing]," (2) "plan[] and provid[e] technical assistance to stakeholder agencies in reporting data required by the OJJDP," (3) "collect[], compil[e], and analyz[e] data reports to identify short- and long-term trends in juvenile detention and incarceration," and (4) "assist[] the Assistant Director for Community Services and the DYS Director with projects requiring data analysis and reporting." Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 12. The record does not suggest that Ms. Wilson was responsible for any of those job duties. *Compare id.*, *with* Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 9–10.

[46] Ex. 3 (Aff. of Thomas Messer) to Def.'s Mot. for Summ. J. (Doc. 29-3) ¶ 6; Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 30; Ex. 4 (Aff. of Michael Crump) to Def.'s Mot. for Summ. J. (Doc. 29-4) ¶ 7. The record evidence regarding this Staff Development Coordinator position is a bit murky. For one thing, the record includes a "Functional Job Description" for Mr. Messer's previous DHS Compliance Monitoring Coordinator position. Ex. 3 (Aff. of Thomas Messer) to Def.'s Mot. for Summ. J. (Doc. 29-3) at 6. That document lists "DHS Compliance Monitoring Coordinator" as the position's "Functional Job Title," but lists "Staff Development Coordinator" as the position's "OPM Job Title." *Id.* Another "Functional Job Description" document lists a position that has the "Functional Title" of "Internal Affairs Investigator"—a position Mr. Messer would soon be transferred into—but also has the "OPM Position Title" of "Staff Development Coordinator." *Id.* at 4 (emphasis removed). The relationship between the OPM titles and the functional titles is not evident in the record. But the undisputed record does tell us that Mr. Messer's job responsibilities changed significantly when he was moved from his DHS Compliance Monitoring Coordinator position to his new Staff Development Coordinator position. *See* Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 15–17.

[47] *Compare* Ex. 3 (Aff. of Thomas Messer) to Def.'s Mot. for Summ. J. (Doc. 29-3) ¶ 7, *and* Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 17, *with* Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 9–10. There is some evidence in the record to suggest that training employees was part of Ms. Wilson's job responsibilities—for example, she trained Mr. Messer on how to do certain parts of his job. Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 13; *see also* Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 10 (showing that the JDC Monitor "may assist in providing training"). But outside of this isolated example, there is no record evidence of Ms. Wilson providing training to employees as part of her job duties. Even the most pro-plaintiff read of the record suggests that, at most, providing training in limited contexts was a part of Ms. Wilson's overall job duties, whereas providing training in a wide variety of areas was the defining responsibility of Mr. Messer's new role.

[48] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 18.

In 2019, the Division of Youth Services was reorganized at the direction of the Governor of Arkansas.[49] The Director of the Division announced that: (1) some Division of Youth Services employees would be moved to positions classified at a lower paygrade pursuant to this reorganization, but (2) no such move would result in an employee receiving lower pay.[50] In July of that same year, the State of Arkansas began transitioning the operations of its juvenile detention centers to third-party contractors.[51] This transition resulted in Mr. Messer being moved from his Staff Development Coordinator position, which was then classified at the GS-7 paygrade, to an Internal Affairs Investigator position classified at the GS-6 paygrade.[52] Pursuant to the Director's announcement, Mr. Messer retained his GS-7 paygrade.[53] In this position, Mr. Messer performed substantially similar duties to those performed by Ms. Wilson in her capacity as an Internal Affairs Investigator.[54]

That's what we know about Mr. Messer. So, we move on to Ricky Gaston.[55] Mr. Gaston was hired by the Department's Division of Medical Services as a DHS Program Manager in December of 2016.[56] After the Department's paygrades were reclassified by state law in July of 2017, Mr. Gaston's position was classified at the GS-8 paygrade.[57] But Mr. Gaston's time as DHS Program Manager was rather short. Although Mr. Gaston was not terminated by the Department

---

[49] *Id.* ¶ 27.

[50] *Id.* ¶ 28.

[51] *Id.* ¶ 29.

[52] *Id.* ¶ 30; *id.* ¶ 19.

[53] *See id.* ¶ 31

[54] Ex. 4 (Aff. of Michael Crump) to Def.'s Mot. for Summ. J. (Doc. 29-4) ¶ 17.

[55] The Amended Complaint alternatively refers to him as "Ricky Gaston" and "Ricki Gaston." *Compare* Am. Compl. (Doc. 18) ¶ 20, *with id.* ¶ 22–25. The Department's Statement of Undisputed Facts refers to him as "Ricky Gaston." *See* Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 20. The Court will use the "Ricky Gaston" spelling.

[56] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 20.

[57] *See id.* ¶ 21.

for any sort of disciplinary reason, his employment as a DHS Program Manager did not last beyond the Department's mandatory probationary period for new employees; he left the Department around the end of 2017.[58]

Like Ms. Wilson, Mr. Gaston was rehired by the Department less than a year later. In September of 2018, Mr. Gaston was hired as a Youth Services Advisor in the Division of Youth Services.[59] The most pro-plaintiff read of the record suggests that this position was substantially similar (if not identical) to the JDC Monitor position Ms. Wilson held from June of 2015 to August of 2019.[60] In 2018, the paygrade for this position was classified at GS-6.[61] But Mr. Gaston was instead paid at the level (GS-8) he was paid when he was a DHS Program Manager.[62] Mr. Gaston was able to be rehired at this higher level of pay because, under relevant state policy, certain former state employees are eligible—but not entitled—to receive their last rate of pay.[63]

With the foregoing facts in mind, the Court will address Ms. Wilson's claims.

## DISCUSSION

All of Ms. Wilson's claims against the Department, whether based on the Equal Pay Act or Title VII of the Civil Rights Act, arise from the same (alleged) misconduct—that the Department paid male employees more than it paid Ms. Wilson for doing equal work.[64] And in the Eighth

---

[58] Id. ¶¶ 21–22; Ex. 5 (Aff. of Ricky Gaston) to Def.'s Mot. for Summ. J. (Doc. 29-5) ¶ 3. There is some inconsistency in the record as to the nature of Mr. Gaston's exit from the DHS Program Manager position. The Department's Statement of Undisputed Facts states that "[Mr. Gaston's] probationary period did not result in him be[ing] retained," suggesting that Mr. Gaston did not leave the DHS Program Manager position on his own accord. Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 21. But Mr. Gaston's affidavit characterizes his exit as a resignation. Ex. 5 (Aff. of Ricky Gaston) to Def.'s Mot. for Summ. J. (Doc. 29-5) ¶¶ 3–4. This inconsistency is not material.

[59] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 23.

[60] See supra note 24.

[61] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 23.

[62] Id. ¶ 25; see also id. ¶ 19.

[63] Id. ¶¶ 24–25.

[64] See Am. Compl. (Doc. 18) ¶ 36; id. at 7 (showing that Ms. Wilson's EEOC charge alleged that she was "denied equal wages and equal pay").

Circuit, sex discrimination claims that solely relate to unequal pay for equal work are governed by the standards of the Equal Pay Act, regardless of whether such claims are brought under the Equal Pay Act itself or brought under Title VII.[65] That means that the Court can and will deal with all of Ms. Wilson's claims simultaneously rather than separately.

"Under the EPA, a plaintiff must establish a prima facie case by 'show[ing] that the defendant paid male workers more than she was paid for equal work in jobs that required equal skill, effort, and responsibility and work performed under similar conditions.'"[66] Jobs don't need to be identical or have the same classification or title to be considered equal work, but they must be at least "substantially equal."[67] Whether a male employee actually performed "equal work" compared to Ms. Wilson requires consideration of (1) the respective "experience, training, education, and ability" of Ms. Wilson and the male comparator; (2) the "physical or mental exertion needed to perform the [respective] job[s]," and (3) the "degree of accountability required in performing [each] job."[68]

If Ms. Wilson is able to mount a prima facie case, "the burden shifts to the defendant to prove one of the affirmative defenses set forth under the EPA."[69] Those statutory defenses shield employers from liability in situations where the pay disparity is attributable to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of

---

[65] *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003). It is true that not all Title VII sex discrimination claims involving compensation overlap with the Equal Pay Act. In a circumstance where an employer "intentionally depresses wages on account of sex," but "there were no employees of the opposite sex doing equal work for more pay," an employer may violate Title VII without violating the Equal Pay Act. *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003). But Ms. Wilson doesn't allege such circumstances in her Amended Complaint. So the Court can analyze both the Title VII claim and the Equal Pay Act claim under the same standard.

[66] *Taylor*, 321 F.3d at 715 (quoting *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 718–19 (8th Cir. 2000)).

[67] *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002).

[68] *Buettner*, 216 F.3d at 719.

[69] *Taylor*, 321 F.3d at 715.

production; or (iv) a differential based on any other factor other than sex . . . ."[70] To prevail at the summary judgment stage, a defendant relying on one of these statutory defenses must establish the defense as a matter of law such that no reasonable jury could conclude otherwise.[71]

In this case, Ms. Wilson has pointed to male Department employees that she alleges were paid more than she was for performing equal work. For Ms. Wilson's claims to survive summary judgment, the Court must first determine that at least one of these employees was paid more than Ms. Wilson for equal work, and must then determine that the Department hasn't met its burden in conclusively establishing an affirmative defense that would explain such a pay disparity. There are only two potential comparators here: Mr. Messer and Mr. Gaston.[72] The Court will examine each in turn.

### A. Thomas Messer

During the time period relevant to the instant case, Mr. Messer held three different jobs with the Division of Youth Services; he was first a JDC Compliance Monitoring Coordinator, then

---

[70] 29 U.S.C. § 206(d)(1).

[71] *Tenkku*, 348 F.3d at 741 n.2. This is different from the burden placed on an employer in the *McDonnell Douglas* framework used in many Title VII cases involving indirect evidence of discrimination. In those cases, an employer must merely articulate a "legitimate non-discriminatory reason" for an adverse employment action. *See Taylor*, 321 F.3d at 716. In Equal Pay Act cases, however, the employer must actually "prove that the pay differential was based on a factor other than sex." *Id.*

[72] The Amended Complaint also mentions a man named Brandon Alan Clingman who (1) was hired as an Internal Affairs Investigator over a year after Ms. Wilson's resignation and (2) received a higher-than-normal starting salary for that position. *See* Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 1–2; Am. Compl. (Doc. 18) ¶ 33; Answer (Doc. 23) ¶ 34 (admitting that "Mr. Clingman began at a starting salary that was higher than the base salary for his position"). In the typical Equal Pay Act case, appropriate comparators are drawn from the plaintiff's contemporaneously-employed colleagues or immediate predecessors or successors. *Cf. Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 492 (8th Cir. 2003). And Mr. Clingman was not Ms. Wilson's immediate successor. Over a year had passed between Ms. Wilson's resignation and Mr. Clingman's hiring. It is true that non-immediate successors can sometimes serve as comparators for Equal Pay Act purposes—but only when appropriate. *See Broadus v. O.K. Indus., Inc.*, 226 F.3d 937, 941–42 (8th Cir. 2000). Use of non-immediate successors is most often appropriate when a plaintiff does not have an immediate predecessor, immediate successor, or contemporaneous colleague who engaged in substantially equal work. *See id.* at 942. Here, however, Ms. Wilson had at least one contemporaneous male colleague that performed substantially equal work in both her capacity as a JDC Monitor (*e.g.*, a man named Eugene Lamb III, *see* Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 9) and her capacity as an Internal Affairs Investigator (*e.g.*, Mr. Messer). Use of a non-immediate successor like Mr. Clingman is therefore inappropriate in the instant case.

a Staff Development Coordinator, and then an Internal Affairs Investigator. In his capacities as JDC Compliance Monitoring Coordinator and Staff Development Coordinator, Mr. Messer did not perform work substantially equal to the work performed by Ms. Wilson in her capacity as JDC Monitor.[73] But the record shows that Mr. Messer and Ms. Wilson performed substantially equal work in their capacities as Internal Affairs Investigators.[74] And the record also shows that, despite performing equal work, Mr. Messer was classified at a higher paygrade than Ms. Wilson.[75] So, with respect to the overlapping Internal Affairs Investigator tenures of Mr. Messer and Ms. Wilson, Ms. Wilson has established a prima facie Equal Pay Act case.

The Department asserts an affirmative defense under the "any other factor other than sex" catch-all in 29 U.S.C. § 206(d)(1). The Department argues that Mr. Messer was paid a permissible "red circle rate" pursuant to the Director's announcement that no employee moved to a position with a lower pay grade due to the Division of Youth Services' reorganization would receive less pay.[76] Federal regulations define a red circle rate as an "unusual, higher than normal, wage rate[] . . . maintained for reasons unrelated to sex."[77] And the Eighth Circuit has made clear that a

---

[73] In his capacity as JDC Compliance Monitoring Coordinator, Mr. Messer worked on annual reports to the Office of Juvenile Justice and Delinquency Prevention, whereas Ms. Wilson did not work on those reports. *See supra* note 45. This annual reporting was a significant job responsibility that required "at least a month of work each year." Ex. 3 (Aff. of Thomas Messer) to Def.'s Mot. for Summ. J. (Doc. 29-3) ¶ 4. That certainly qualifies as more than an "insubstantial or minor difference" in job duties. *See Hunt*, 282 F.3d at 1030. Beyond this, the record also provides a laundry list of job duties assigned to Mr. Messer in his capacity as JDC Compliance Monitoring Coordinator that differ from those assigned to JDC Monitors. *Compare* Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 12 (listing Mr. Messer's job duties), *with* Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 9–10 (listing the job duties and responsibilities assigned to JDC Monitors). In his capacity as Staff Development Coordinator, Mr. Messer's primary duty was to train facility employees on a wide variety of subjects, which is significantly different from what Ms. Wilson was asked to do as a JDC Monitor. *See supra* note 45. That clearly constitutes significantly unequal work. No reasonable jury could find that Mr. Messer and Ms. Wilson performed equal work during Mr. Messer's time as JDC Compliance Monitoring Coordinator or Staff Development Coordinator.

[74] Ex. 4 (Aff. of Michael Crump) to Def.'s Mot. for Summ. J. (Doc. 29-4) ¶ 17.

[75] *See supra* pages 5, 8.

[76] *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 31) at 15–18.

[77] 29 C.F.R. § 1620.26(a).

12

red circle rate can constitute a "factor other than sex" sufficient to establish an affirmative defense under the Equal Pay Act.[78]

The higher pay received by Mr. Messer fits neatly within the definition of a red circle rate provided by federal regulations. Mr. Messer's GS-7 paygrade was unusual and higher than the standard GS-6 paygrade for the Internal Affairs Investigator position. But he got this unusual rate because he had it in his previous position prior to the reorganization. And the record conclusively shows that he maintained this unusually high paygrade pursuant to a general policy that protected employees from suffering pay decreases due to reorganization-driven reassignments.[79] That's clearly a reason unrelated to sex.[80] No reasonable jury could find otherwise. Accordingly, the

---

[78] See Price v. N. States Power Co., 664 F.3d 1186, 1193 (8th Cir. 2011). It's worth noting a potential counterpoint here. The federal regulations provide several non-exhaustive examples of bona fide red circle rates. Those examples include (but are not limited to) maintaining a highly skilled employee's higher wage during a temporary reassignment to a less-demanding position or maintaining the higher wage of a long-tenured employee in ill health that is moved to a less-demanding position. 29 C.F.R. § 1620.26(a)–(b). Obviously, neither of the just-mentioned examples is a perfect analogue to the Department policy at issue. But, although the Eighth Circuit has not explicitly laid out the limitations of the red circle rate concept, the Eighth Circuit has endorsed a broad, inclusive reading of the "any other factor other than sex" affirmative defense. See Taylor, 321 F.3d at 717–18. And, in a decision that was cited approvingly by the Eighth Circuit, the Sixth Circuit emphasized that red circling "has yet to be defined in all of its manifestations," and stressed that the concept is intentionally flexible. Timmer v. Mich. Dep't of Com., 104 F.3d 833, 844 (6th Cir. 1997) (quoting Gosa v. Bryce Hosp., 780 F.2d 917, 919 (11th Cir. 1986)); see also Price, 661 F.3d at 1193 (citing Timmer, 104 F.3d at 844). In short, the red-circle defense is not limited to the express examples in the regulation or even to perfect analogues of those examples.

[79] See Ex. 4 (Aff. of Michael Crump) to Def.'s Mot. for Summ. J. (Doc. 29-4) ¶¶ 4–9. The record also shows that, pursuant to the same policy that allowed Mr. Messer to retain his higher paygrade, a female employee forced to change positions due to the reorganization was also allowed to keep her previous, higher paygrade classification. Id. ¶ 11. This supports the conclusion that the red circle rate was genuine and nondiscriminatory. And nothing in the record contradicts this conclusion.

[80] The Eighth Circuit has affirmed summary judgment against equal-pay-equal-work plaintiffs in a similar situation to the case at bar. In Price, the employer had a red circle rate policy whereby existing employees who transitioned to a field representative role would keep the base pay from their previous positions. Price, 664 F.3d at 1189. The Eighth Circuit characterized the "differences in starting salaries of field representatives" caused by this red circle rate as "legitimate . . . ." Id. at 1193. Given that the evidence showed that the pay differentials at issue were the result of legitimate compensation policies, including this red circling policy, the panel held that (1) the plaintiffs needed to do more than "merely point to a raw difference in pay between men and women to prevail," and (2) the "evidence [was] sufficient to establish [the employer's] affirmative defenses." Id. at 1193–94. Here, as in Price, the red circling policy allows employees that change positions to retain their previous, higher base pay rate. And as in Price, the Department's red circle rate is a legitimate, nondiscriminatory explanation for the pay discrepancy at issue.

Department has established an affirmative defense as a matter of law with respect to the pay disparity between Mr. Messer and Ms. Wilson.

## B. Ricky Gaston

Recall that, like Ms. Wilson, Mr. Gaston held a position at the Department, left the Department, and then returned to the Department as a Youth Services Advisor.[81] But unlike Ms. Wilson, Mr. Gaston was allowed to retain his previous, higher paygrade in his new Youth Services Advisor position.[82] On the read of the record most favorable to Ms. Wilson, Mr. Gaston—in his capacity as a Youth Services Advisor—performed work substantially equal to that performed by Ms. Wilson in her capacity as JDC Monitor.[83] And the record shows that, despite performing equal work, Mr. Gaston was classified at a higher paygrade than Ms. Wilson.[84] So, with respect to Mr. Gaston's time as Youth Services Advisor, Ms. Wilson has established a prima facie Equal Pay Act case.

Still, there's a big problem with Ms. Wilson's reliance on Mr. Gaston. Insofar as her Equal Pay Act and Title VII claims rely on the disparate pay between Ms. Wilson and Mr. Gaston, they are barred by the relevant statutes of limitations. Any cause of action under the Equal Pay Act "shall be forever barred unless commenced within two years . . . ."[85] Mr. Gaston was hired as a

---

[81] *See supra* pages 8–9.

[82] *See id.*

[83] *See supra* note 24; Ex. 7 (Reqs. for Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 9 (showing that the JDC Monitor position was also referred to as "Youth Services Advisor").

[84] *See supra* page 9.

[85] *See* 29 U.S.C. § 255(a); *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 579–80 (8th Cir. 2006) (citing 29 U.S.C. § 255(a)). It is true that, "if an employee can show that the employer willfully violated the Equal Pay Act, the statute of limitations is three years . . . ." *Simpson*, 441 F.3d at 579–80. But even if the Department violated the Equal Pay Act, nothing in the record suggests—and no reasonable jury could find—that any such violations were willful. *Cf. id.* at 580 ("A finding of willfulness requires behavior on the part of the employer that exceeds negligence; the employer must act knowingly or with reckless disregard of whether the contested conduct was prohibited."). So the standard two-year statute of limitations applies in the instant case.

Youth Services Advisor in September of 2018.[86] On August 21, 2019, Ms. Wilson left her JDC Monitor Position for the Internal Affairs Investigator position—and thus no longer engaged in work equal to that performed by Mr. Gaston.[87] So, on August 21, 2019 (at the latest), the statute-of-limitations clock started on any Equal Pay Act claim Ms. Wilson could bring regarding the pay disparity between her and Mr. Gaston. But Ms. Wilson did not file her original Complaint until August 30, 2022.[88] Such a claim is therefore time-barred.

Ms. Wilson's Title VII claim is also time-barred insofar as it relies on the pay disparity between her and Mr. Gaston. A Title VII charge must be filed with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ."[89] As stated above, Mr. Gaston and Ms. Wilson stopped performing equal work for unequal pay in August of 2019. But Ms. Wilson did not file her charge with the EEOC until December of 2021.[90] And "[t]he timely filing of a charge of discrimination with the EEOC is a prerequisite to court action under Title VII."[91] Accordingly, any Title VII claim reliant on the pay disparity between Ms. Wilson and Mr. Gaston is time-barred.

## CONCLUSION

For the foregoing reasons, the Arkansas Department of Human Services' Motion for Summary Judgment[92] is GRANTED. Judgment will be entered for the Department on all the claims substantively discussed in this Motion, and this case will be CLOSED.

---

[86] Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 23.

[87] *See* Ex. 4 (Aff. of Michael Crump) to Def.'s Mot. for Summ. J. (Doc. 29-4) ¶ 3.

[88] Compl. (Doc. 1).

[89] 42 U.S.C. § 2000e-5(e)(1).

[90] Ex. 7 (Reqs. For Admis.) to Def.'s Mot. for Summ. J. (Doc. 29-7) at 5.

[91] *Greene v. Carter Carburetor Co.*, 532 F.2d 125, 126 (8th Cir. 1976).

[92] Doc. 29.

IT IS SO ORDERED this 16th day of July 2025.

                                                                                      _____
                                                                                      LEE P. RUDOFSKY
                                                                                      UNITED STATES DISTRICT JUDGE